IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SAMANTHA A. KENDALL, )
 )
        Plaintiff, )
 )
v. ) No. 07 C 1841
 )
VILLAGE OF MAYWOOD, a municipal )
corporation, THE BOARD OF )
TRUSTEES OF THE VILLAGE OF )
MAYWOOD, ROBERT L. NELIS, SR., )
as Village Manager of the )
Village of Maywood, and )
individually, JASON ERVIN, as )
the Finance Director of the )
Village of Maywood, and )
JUNE PRICE, as the Director of )
Parks and Recreation of the )
Village of Maywood, )
 )
        Defendants. )

## OPINION AND ORDER

Plaintiff Samantha Kendall worked as the Administrative Aide to defendant Robert Nelis, who was then the Village Manager of defendant Village of Maywood. Plaintiff was hired effective January 9, 2006. In February 2006, plaintiff's daughter was murdered in Maywood. At an April 4, 2006 meeting of the Village's Board of Trustees, plaintiff spoke during the public comments session of the meeting. She stated that there had been

no arrests for her daughter's murder and other shootings. Plaintiff alleges that defendants thereafter retaliated against her for speaking on a matter of public concern in violation of plaintiff's First Amendment rights. Plaintiff also alleges that the retaliation resulted in her constructive discharge, with plaintiff resigning from her employment effective July 12, 2006. Also named as defendants are former Finance Director Jason Ervin and former Director of Parks and Recreation June Price.

The Village Board of Trustees, in their official capacities only, are also named as defendants. Suing the Board and any of the individual defendants in their official capacities is the same as suing the Village itself and therefore unnecessary. See Doe v. Smith, 470 F.3d 331, 337 n.12 (7th Cir. 2006); Mucha v. Village of Oak Brook, 2008 WL 4686156 *1 n.1 (N.D. Ill. May 29, 2008). The Complaint is unclear as to whether Ervin and Price were sued in their individual capacities as well as their official capacities. Since Nelis and Price are no longer employed by the Village, they can no longer be sued in their official capacities. Ervin could still be named in his official capacity as Village Manager (his current position), but like the Trustees, that would be redundant of suing the Village itself.

Presently pending is defendants' motion for summary judgment. On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. Scott v. Harris, 127 S. Ct. 1769, 1774, 1776 (2007); Fischer v. Avanade, Inc., 519 F.3d 393, 401 (7th Cir. 2008); Scaife v. Cook County, 446 F.3d 735, 738-39 (7th Cir. 2006). The burden of establishing a lack of any genuine issue of material fact rests on the movant. Hicks v. Midwest Transit, Inc., 500 F.3d 647, 651 (7th Cir. 2007); Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer, 472 F.3d 943, 946 (7th Cir. 2007); Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001). The nonmovant, however, must make a showing sufficient to establish any essential element for which she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Hicks, 500 F.3d at 651; Jumer, 472 F.3d at 946. The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. Celotex, 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. See Lorillard Tobacco Co. v. A & E Oil, Inc., 503 F.3d 588, 594-95 (7th Cir. 2007); Yasak v.

Retirement Bd. of Policemen's Annuity & Benefit Fund of Chicago, 357 F.3d 677, 679 (7th Cir. 2004); NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 236 (7th Cir. 1995); Covalt v. Carey Canada, Inc., 950 F.2d 481, 485 (7th Cir. 1991); Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 476-77 (7th Cir. 1988); Freundt v. Allied Tube & Conduit Corp., 2007 WL 4219417 *2 (N.D. Ill. Nov. 29, 2007). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Logan v. Commercial Union Ins. Co., 96 F.3d 971, 978 (7th Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" Logan, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." Id. (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that

> could affect the outcome of the suit under
> governing law will properly preclude the entry of
> summary judgment." McGinn v. Burlington Northern
> R.R. Co., 102 F.3d 295, 298 (7th Cir. 1996)
> (citation omitted). Furthermore, a factual
> dispute is "genuine" for summary judgment
> purposes only when there is "sufficient evidence
> favoring the nonmoving party for a jury to return
> a verdict for that party." Anderson v. Liberty
> Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505,
> 91 L. Ed. 2d 202 (1986). Hence, a "metaphysical
> doubt" regarding the existence of a genuine fact
> issue is not enough to stave off summary
> judgment, and "the nonmovant fails to demonstrate
> a genuine issue for trial 'where the record taken
> as a whole could not lead a rational trier of
> fact to find for the non-moving party . . . .'"
> Logan, 96 F.3d at 978 (quoting Matsushita Elec.
> Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.
> 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538
> (1986)).

Outlaw, 259 F.3d at 837.

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purpose of ruling on defendants' summary judgment motion are as follows. In October 2005, Nelis became Village Manager of Maywood. Effective January 9, 2006, plaintiff was hired to be Nelis's Administrative Aide. At the time Nelis became Village Manager, there were crime issues and crime problems in Maywood. According to Nelis, Maywood was facing a series of crime problems, including drugs, prostitution, and gangs.

The Village Manager is the chief administrative officer responsible for the daily functioning of the Village. Unless otherwise provided by the Board, the Village Manager has control over all departments and may appoint or remove all department heads. The Village Manager has the power to appoint and discharge any Village employee except those subject to civil service.

Plaintiff was hired as a probationary employee. The Village Code provides that the probationary period shall be six months, but may be extended with the approval of the Village Manager for a total period not to exceed 12 months. A probationary employee may be dismissed without prior hearing or notice; such dismissal is not subject to the grievance procedure of the Village's Personnel Code; and a probationary employee may not use vacation, sick, funeral, or jury duty leave. Other than plaintiff, Nelis never extended or modified any employee's probationary period.

As Nelis's Administrative Aide, plaintiff's duties included creating a welcoming atmosphere in the office; being a liaison between citizens and Nelis; keeping Nelis's schedule; handling Nelis's telephone calls; dictation and typing; and handling Nelis's faxes. Plaintiff's desk was located just outside Nelis's office. Plaintiff frequently had contact with the Police Department. Plaintiff was privy to much information

known by Nelis, including sensitive information, and was expected to keep it confidential. Plaintiff contends this fact is not sufficiently established because Nelis, during his deposition testimony, could not name a specific confidential document or piece of information plaintiff handled. His generalized statement as to this fact, however, is sufficient and plaintiff does not point to contrary testimony of her own or anyone else. Also, there is evidence in the record of a sexual harassment investigation and review of the Police Department while plaintiff was employed for which she had access. Although privy to policymaking information, plaintiff did not herself decide policy.

Through April 4, 2006, plaintiff was satisfied with and liked her job. She got along well with all the other employees and departments.

On Valentine's Day 2006, plaintiff's daughter, Amanda Gallon, was killed by a random shot while sitting in a car in Maywood. As he did with all shootings in Maywood, Nelis emailed Board members to inform them. As to this shooting, he noted: "this one is very personal to me and the Village's staff. My new secretary Samantha Kendall's daughter [was] killed last night." Nelis granted plaintiff open-ended leave without pay and told her to do what she needed to do. Probationary employees are not entitled to bereavement leave. This was not bereavement leave

since it was without pay. On March 13, plaintiff returned to work.

Following the shooting of plaintiff's daughter, there had been a number of other shootings in Maywood. Maywood's Mayor declared April to be "Safe Streets-Clean Streets Month," in part to promote crime prevention awareness. Crime and murder was a topic at nearly every Board meeting and violence was a concern of the community, Board, and Village staff.

The April 4, 2006 Village Trustees' meeting had a public comments session. During that session, plaintiff walked to the podium and stated the following:[1]

> My name is Samantha Kendall. I am the Administrative Aide to the Village Manager. Um, I just have one question. What is the delay or difficulty in bringing offenders forward for senseless murders and shootings? Specifically, the murder of my daughter Amanda Gallon and the shooting of Christopher King and Theodore Donley on February 14 of this year. My family has no answers--they want answers. Thank you.

During the public comments session, others also commented about various Maywood shootings.

As Village Manager, it was Nelis's responsibility to provide a response following the completion of all the public comments. After he completed his response, a woman, who

---

[1] A video recording of the pertinent portions of the meeting is provided. The only transcription provided is of plaintiff's initial statement and some partial sentences.

- 8 -

identified herself as Amanda's grandmother, complained that Nelis had not responded to comments about the shootings. Nelis then stated that he could not comment on ongoing investigations. Plaintiff then complained that there had been a lot of witnesses, a detective had told her the police knew who had done it, and people had been taken in for questioning, but still there was no arrest. When Nelis started talking again, plaintiff interrupted, stating she understood what he was saying and was not "disrespecting" him, but "the community will not lay down to the insidiousness" of the Police Department.² While still speaking to Nelis and the Board, plaintiff also made comments about then-acting Police Chief Mobley, but her actual words were not clearly picked up on the video.³ When plaintiff ended, she waved her arm at Nelis in a dismissive manner.

---

²Defendants characterize plaintiff as "shouting" and "heated." Plaintiff was trying to talk loud enough to be heard, but she was not shouting. At some points, yelling is heard on the video, but the video does not show that it was plaintiff yelling. It was clear that plaintiff was angry about the situation, but she remained controlled and relatively calm. She was less heated than Amanda's grandmother. While a finder of fact could possibly characterize plaintiff as heated, it is not a necessary finding.

³Citing Nelis's deposition testimony, defendants contend plaintiff insulted Mobley on her way out. (If the insult allegedly occurred in the hallway, Nelis's testimony could not have been based on personal knowledge.) That was not picked up by the video and Mobley does not recall it. This fact is not conclusively established and will not be taken as true for purposes of ruling on summary judgment.

Having his Administrative Aide provide a welcoming atmosphere for his office was important to Nelis. Nelis and Ervin testified that, following Amanda's murder and plaintiff's statements at the Board meeting, they perceived tension in the air when Mobley would come to Nelis's office. Mobley, however, testified that he himself did not perceive such a tension and did not avoid the office because of Nelis's presence. On defendants' summary judgment motion, it must be taken as true that plaintiff did not create an unwelcoming atmosphere for the Village Manager's office.

Plaintiff had previously scheduled to be off work on Wednesday April 5, 2006. Upon returning to work on April 6, she did not discuss her public session comments with anyone at work.

Nelis believed that plaintiff's comments at the Board meeting were inappropriate. Nelis believed the topics of murder and crime were issues of public interest, but plaintiff introducing herself as his Administrative Aide turned it into a work-related comment. He believed their interplay at the meeting displayed a rift in the office which he believed was not good for organizational dynamics. He wanted the two of them to be seen as working together, which would make for smoother office operations. Before meeting with plaintiff to discuss these issues, Nelis

reviewed the video of the meeting and consulted with the Village's attorney.[4]

On April 10, 2006, plaintiff met with Nelis in his office. Ervin was present because the meeting potentially affected finances. Price was present to ensure nothing inappropriate was said. Nelis gave plaintiff a written memorandum entitled Performance Expectations, which plaintiff read and stated she understood. The memorandum listed six points regarding the "fundamental and basic requirements" of plaintiff's position. The confidential nature of the position was emphasized. It was stated that they must work together as a team with her "100% on [his] side." "A rift sends the wrong message; the message that I am now attempting to send is 'professionalism' and jointly working to achieve goals--not individuals pursuing their own objectives." He emphasized the need for close positive working relations with all departments, including the Police Department, with no favoritism for some or animosity for others. He stated that plaintiff should not disclose internal workings to persons or organizations outside the Village's organization, nor use any perceived special knowledge on her part in an effort to influence

---

[4]Plaintiff submits a draft of the April 10, 2006 memorandum described below, setting forth changes made after consulting the attorney. Defendants object that the draft is protected by the attorney-client privilege. It is unnecessary to consider the draft version, which was not presented to plaintiff.

others. Another point was: "When I told you that we needed to have a meeting, you told me that your off duty activities do not have to be discussed. Activities conducted outside of the 'workday' or 'off duty' do not have an impact on a position unless the action impedes conducting the responsibilities of the position."

The closing paragraphs of the memorandum are:

> Samantha, the manner in which you made recent public comments and the verbal exchange with me that followed negatively impacted our relationship and that with some other staff members. By announcing that you were my Executive Assistant, it appeared that my office was connected to what you stated. In addition, the confrontational and somewhat heated manner of the exchange was disruptive to the meeting and unprofessional. I count on you for confidentiality, loyalty, and discursion [sic], and that should be the basis of our relationship and the image projected to the public. I have demonstrated empathy for the pain the death of your daughter caused, however, given your position it is important that you work within the system.
> I think you need to consider your position and whether or not you wish to continue working as the Executive Assistant. Please include in your deliberations the fact that a transfer, to the Finance Department, is available right now. Please also consider that I will be utilizing the above points and others related to performance when I evaluate you and determine if you will pass probation.

At the April 10 meeting, plaintiff was not given a title or description of the possible Finance Department position. Prior to April 10, such a possible position had not been offered

to plaintiff. Nelis testified that the offer of a transfer was motivated in part by plaintiff's public comments. Plaintiff was satisfied with the job she had; she did not want to transfer.

Nelis requested that plaintiff provide a written response to the April 10 memorandum. Plaintiff responded in a letter dated April 12 that she personally handed to Nelis. She stated that she had never violated his confidence and was a team player, and would continue to uphold such responsibilities. As to the public comments, she stated in part:

> . . . I did not come [to the Board meeting] in my capacity as a village employee but as a citizen of the Village of Maywood whose daughter was savagely murdered on the streets of Maywood who wants answers. . . . I'm sorry if this appears in your estimation to be some form of insubordination, but if the parents of young people who lose their life in Iraq can protest without fear that the government is looking over their shoulder, then why can't a mother who lost her child on the streets of Maywood. To me this is insensitivity.
> As you know, I have never approached you nor asked for updates here in the office or on the streets about the murder investigation. Nor have I gone out and represented to anyone that I am entitled to special treatment. . . .

Plaintiff closes, by stating: "This response in no way, implies my dissatisfaction with the Village or my position; however it is a direct response to what I believe is an unwarranted memorandum and meeting, especially, since there has not been any evidence recited to in the memorandum nor in the past that I would compromise this office or you."

Thereafter, Nelis continued to inform plaintiff that her correspondence and public comments would be taken into consideration in determining if she would pass probation. He also continued to mention the possibility of transferring to the Finance Department. These statements were made both in Nelis's April 18 memorandum responding to plaintiff's April 12 letter and in oral statements thereafter.

Ordinarily, plaintiff's six-month probationary period would have ended approximately Sunday, July 9, 2006. Near the end of May 2006, Nelis informed plaintiff that the three weeks of leave she took following her daughter's murder would not count toward serving the six-month probationary period. He had not previously indicated that this leave would affect her probationary period. No Village ordinance or rule specifically addresses the effect of such leave on the probationary period. In the beginning of July 2006, plaintiff asked Nelis about her probationary period and he again stated it would not end until the additional three weeks had been worked. On July 12, plaintiff again asked and received the same answer. That same day, plaintiff submitted a letter to Nelis in which she resigned. The resignation was accepted by Nelis and plaintiff's employment was terminated effective that day. In the resignation letter, plaintiff indicated the resignation was primarily in response to Nelis's decision regarding the leave affecting her probationary period.

As a general rule, a municipality cannot retaliate against one of its employees for engaging in speech protected by the First Amendment. See Callahan v. Fermon, 526 F.3d 1040, 1043-44 (7th Cir. 2008); Kiddy-Brown v. Blagojevich, 408 F.3d 346, 357 (7th Cir. 2005); Vargas-Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 970 (7th Cir. 2001). The employee must demonstrate both that the speech was constitutionally protected and that the speech was a substantial or motivating factor for the challenged retaliatory action. Callahan, 526 F.3d at 1044; Kiddy-Brown, 408 F.3d at 357. To be constitutionally protected speech, the employee's interest in speaking as a citizen on a matter of public concern must outweigh the municipality's interest in promoting the efficiency of its public services. Chaklos v. Stevens, ___ F.3d ___, ___, 2009 WL 807577 *5 (7th Cir. March 30, 2009); Kiddy-Brown, 408 F.3d at 357. In conducting such Pickering balancing,[5] the Seventh Circuit has identified seven factors to consider: "(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which

---

[5] See Pickering v. Board of Educ., 391 U.S. 563 (1968).

the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public." Kiddy-Brown, 408 F.3d at 358 n.7 (quoting Wright v. Illinois Dept. of Children & Family Serv., 40 F.3d 1492, 1504 (7th Cir. 1994)).

Relying on political patronage cases which hold that a municipal employee's political affiliation may not be taken into consideration unless the employee is a policymaking official, see generally Elrod v. Burns, 427 U.S. 347 (1976); Branti v. Finkel, 445 U.S. 507 (1980), the Seventh Circuit has also recognized a policymaking corollary to Pickering balancing. See Kiddy-Brown, 408 F.3d at 358; Vargas-Harrison, 272 F.3d at 971; Iovinelli v. Pritchett, 2008 WL 2705446 *14 (N.D. Ill. July 9, 2008). Under the corollary, fact-specific balancing is not required if the need for political allegiance and loyalty from a policymaking employee sufficiently outweighs the employee's freedom of expression. Vargas-Harrison, 272 F.3d at 973. This can occur when a policymaking employee's speech on a matter of public concern is critical of superiors or their policies. Kiddy-Brown, 408 F.3d at 358; Vargas-Harrison, 272 F.3d at 971, 973; Iovinelli, 2008 WL 2705446 at *14. It can also occur when the speech implicates the employee's political viewpoints. Vargas-Harrison, 272 F.3d at 973; Iovinelli, 2008 WL 2705446 at *15. The corollary does not apply if the employee's speech

"does not implicate the employee's politics or substantive policy viewpoints." Vargas-Harrison, 272 F.3d at 973-74 (quoting Bonds v. Milwaukee County, 207 F.3d 969, 979 (7th Cir. 2000)). Accord Iovinelli, 2008 WL 2705446 at *14; Matrisciano v. Walker, 417 F. Supp. 2d 1014, 1023 (C.D. Ill. 2006). It also does not apply to speech critical of a superior's abuse of office. Vargas-Harrison, 272 F.3d at 973 n.4; Bonds, 207 F.3d at 979; Iovinelli, 2008 WL 2705446 at *15. "[W]hen the employee's speech addresses matters that have no impact on his official duties, there is a diminished threat that this expression will hamper the government's performance of its functions" and the corollary generally will not apply. Vargas-Harrison, 272 F.3d at 973; Iovinelli, 2008 WL 2705446 at *14; Matrisciano, 417 F. Supp. 2d at 1023.

Here, the evidence conclusively supports that Nelis, as Village Manager responsible for the daily functioning of the Village, was a policymaking official for purposes of applying the Elrod-Branti line of patronage cases. See Curinga v. City of Clairton, 357 F.3d 305, 313 (3d Cir. 2004); Rodez v. Village of Maywood, 641 F. Supp. 331, 337 (N.D. Ill. July 18, 1986). As the Village Manager's confidential assistant, plaintiff was a "confidential" employee who could also be discharged for political reasons. See Soderbeck v. Burnett County, Wis., 752 F.2d 285, 288 (7th Cir. 1985); Hobler v. Brueher, 325 F.3d 1145, 1153 (9th Cir. 2003); McReynolds v. Martin, 2007 WL 2669565

*2 (C.D. Ill. Aug. 14, 2007). The policymaking corollary potentially applied to plaintiff in her confidential position. Nanavaty v. City of Indianapolis, 2001 WL 1781924 *11 (S.D. Ind. Dec. 19, 2001), aff'd by unpublished order, 44 Fed. App'x 7 (7th Cir. 2002).

While crimefighting was more directly the responsibility of the Police Department, crime in the Village was also a concern for the Village Manager. Nelis had frequent contact with the Police Department. He coordinated activities with them and had budgetary and purchasing responsibilities for the Police Department. He was also responsible for searching for a new Police Chief when a vacancy occurred. While plaintiff's criticisms at the Board meeting were directed at the Police Department, such criticism would also reflect on Nelis who had overall responsibility for the Village. Also, criticism of the Police Department coming from Nelis's immediate assistant had the potential to create a rift between Nelis and the Police Department, a concern that Nelis expressed to plaintiff.

While plaintiff's speech did not implicate political viewpoints, it did concern substantive police policy for which Nelis had some responsibility. While plaintiff herself did not set any substantive police policy, such policies were still related to her job duties because she was a confidential employee of Nelis who was involved in substantive aspects of police policy. This is a policy area where Nelis could demand loyalty

from his confidential Administrative Aide and limit her freedom of expression. Nelis could have discharged or refused to hire plaintiff based on her engaging in speech critical of Village police policy. Cf. Nanavaty, 2001 WL 1781924 at *11. He was also free to take lesser actions of admonishing plaintiff not to engage in such conduct in the future, suggesting she transfer to another department, and modifying her term of probation. Since plaintiff's job duties and the content of her speech fall under the policymaking corollary, plaintiff has no cognizable First Amendment claim. It is unnecessary to further consider the fact-specific Pickering balance or any of the other issues raised by the parties.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment [107] is granted. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff dismissing plaintiff's cause of action with prejudice.

ENTER:

William T. Hart
UNITED STATES DISTRICT JUDGE

DATED: APRIL 9, 2009